J-S67002-15

2016 PA Super 36

| | | |
|---|---|---|
| DARRELL AND KATHLEEN MARKS, | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellants | : | |
| | : | |
| v. | : | |
| | : | |
| REDNER'S WAREHOUSE MARKETS, | : | |
| AND REDNER'S MARKETS, INC., | : | |
| | : | |
| Appellees | : | No. 890 MDA 2015 |

Appeal from the Order entered April 23, 2015,
Court of Common Pleas, Lackawanna County,
Civil Division at No. 13 CV 6735

BEFORE: BOWES, PANELLA AND PLATT*, JJ.

OPINION BY BOWES, J.: **FILED FEBRUARY 17, 2016**

Darrell and Kathleen Marks (collectively, "Appellants") appeal from the entry of summary judgment in favor of Redner's Warehouse Markets and Redner's Markets, Inc. (collectively, "Redner's") after the trial court applied Maryland's doctrine of contributory negligence and determined that Mr. Marks' negligence barred recovery as a matter of law. We affirm in part, reverse in part, and remand for further proceedings.

We briefly summarize the facts underlying this appeal. Darrell Marks is a resident of Pennsylvania. In August 2012, he was working as a deliveryman for King's Quality Foods, which delivered items to various grocery stores, including the Redner's Warehouse Market in Elkton,

*Retired Senior Judge assigned to the Superior Court.

Maryland.[1]   On August 20, 2012, while attempting to pull a hand truck containing products into the service entrance of the store, Mr. Marks tripped on the forks of a pallet jack that was located just inside the threshold of the door and fell to the ground, injuring his knee.

On December 10, 2013, Appellants filed a complaint in Lackawanna County, Pennsylvania, asserting claims of negligence and loss of consortium. On November 19, 2014, Redner's filed a motion for summary judgment arguing that the trial court must apply Maryland law and that under Maryland law, Appellants could not recover because Mr. Marks was contributorily negligent in bringing about his own injury.   Following argument, the trial court granted Redner's' motion.

Appellants timely filed this appeal.   They present the following two questions for our review:

> 1.   Whether the trial court committed an error of law when it determined [that] Maryland law applied to this case, when both parties are from Pennsylvania and Pennsylvania has a greater interest in the result of the case than does Maryland where the incident occurred?
>
> 2.   Whether the trial court committed an error of law or abuse of discretion when it determined that [Redner's] could not be found 100% responsible for the incident and resulting injuries?

Appellants' brief at 4.

We begin with our standard of review:

---

[1]   Both King's Quality Foods and Redner's are registered Pennsylvania corporations.   Redner's operates stores in Pennsylvania, Maryland, and Delaware.

Pennsylvania law provides that summary judgment may be granted only in those cases in which the record clearly shows that no genuine issues of material fact exist and that the moving party is entitled to judgment as a matter of law. The moving party has the burden of proving that no genuine issues of material fact exist. In determining whether to grant summary judgment, the trial court must view the record in the light most favorable to the nonmoving party and must resolve all doubts as to the existence of a genuine issue of material fact against the moving party. Thus, summary judgment is proper only when the uncontroverted allegations in the pleadings, depositions, answers to interrogatories, admissions of record, and submitted affidavits demonstrate that no genuine issue of material fact exists, and that the moving party is entitled to judgment as a matter of law. In sum, only when the facts are so clear that reasonable minds cannot differ, may a trial court properly enter summary judgment. With regard to questions of law, an appellate court's . . . review is plenary. The Superior Court will reverse a grant of summary judgment only if the trial court has committed an error of law or abused its discretion.

*McDonald v. Whitewater Challengers, Inc.*, 116 A.3d 99, 104-05 (Pa.Super. 2015) (quoting *Charlie v. Erie Ins. Exch.*, 100 A.3d 244, 250 (Pa.Super. 2014)).

Appellants argue that the trial court erred in determining that Maryland law applies. In addressing which substantive law to apply, we employ the conflict-of-law principles that our High Court framed in *Griffith v. United Air Lines, Inc.*, 203 A.2d 796 (Pa. 1964). In *Griffith*, our Supreme Court altered its approach in determining which substantive law to apply in tort cases. Prior to that decision, Pennsylvania followed the *lex loci delicti* rule, which applied the substantive law of the place where the tort was committed. *Id*. at 801. However, the High Court abandoned that mechanical approach in favor of a methodology that combined the

"government interest" analysis and the "significant relationship" approach of sections 145 and 146 of the Restatement (Second) of Conflicts, which we reproduce *infra*.[2]  ***Id***. at 801-06; ***Troxel v. A.I. duPont Inst.***, 636 A.2d 1179, 1180-81 (Pa.Super. 1994).

   ***Griffith***, ***supra***, addressed the choice of law question in an action brought by the executor of a Pennsylvania resident killed in a plane crash during a landing in Denver on a flight from Philadelphia, Pennsylvania to Phoenix, Arizona.  ***Id***. at 797.  Concluding that the plane crash in Colorado was "purely fortuitous" and that Pennsylvania had a greater interest in the executor's recovery, our Supreme Court discarded the *lex loci delicti* rule for a flexible methodology that permitted courts to conduct an "analysis of the policies and interests underlying the particular issue before the court." ***Griffith***, ***supra*** at 805.  Hence, we utilize this approach herein.

   Section 145(2) of the Restatement (Second) of Conflicts sets forth the contacts to be considered in applying the analysis required under ***Griffith***. They include:

   (a)   the place where the injury occurred;

   (b)   the place where the conduct causing the injury occurred;

   (c)   the domicile, residence, nationality, place of incorporation
   and place of business of the parties; and

---

[2]  The Supreme Court in ***Griffith*** referenced § 379 of a tentative draft of the Restatement (Second) of Conflicts.  ***Griffith***, ***supra*** at 803.  The text of § 379, without significant relevant substantive change, now appears in § 145 and § 146 of the Restatement (Second) of Conflicts (1983).

(d)    the place where the relationship, if any, between the parties is centered.

Restatement (Second) of Conflict of Laws § 145 (1983).

We evaluate these four factors mindful of the overarching choice-of-law principles enumerated in § 6 of the Restatement (Second).  Those considerations include the following:

(a)    the needs of the interstate and international systems;

(b)    the relevant policies of the forum;

(c)    the relevant policies of the other interested states and the relevant interests of those states in determination of a particular issue;

(d)    the protection of justified expectations;

(e)    the basic policies underlying the particular field of law;

(f)    certainty, predictability and uniformity of result; and

(g)    ease in the determination and application of the law to be applied.

*Id*. § 6.

Moreover, as it relates to the instant cause of action, § 146 of the Restatement (Second) establishes a presumption in personal injury cases that favors the application of the law of the state where the injury occurred unless another state has a more significant relationship to the occurrence and the parties.  That section provides:

> In an action for a personal injury, the local law of the state where the injury occurred determines the rights and liabilities of the parties, unless, with

> respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the occurrence and the parties, in which event the local law of the other state will be applied.

*Id*. § 146.

The first step in our analysis is to decide whether there is a true conflict between the laws of Maryland and Pennsylvania. ***Cipolla v. Shaposka***, 267 A.2d 854, 855–56 (Pa. 1970). A true conflict occurs where an analysis of the policies underlying each of the conflicting laws reveals that, in each case, application of the respective state's law would further its corresponding policy. ***Id***. at 855. If a true conflict exists, we then proceed to determine which jurisdiction has the greater interests, considering the qualitative contacts of the states, the parties and the controversy. ***Cipolla***, ***supra*** at 856.

In the present case, the choice of law may determine the outcome of the case. Pennsylvania's comparative negligence statute, 42 Pa.C.S. § 7102, reflects Pennsylvania's policy of providing plaintiffs with a right to at least a partial recovery when they are found 50% or less negligent. ***E.g., Terwilliger v. Kitchen***, 781 A.2d 1201, 1209 (Pa.Super. 2001). This Court has recognized that Pennsylvania has an important interest in protecting its citizens against tortious conduct. ***See Laconis v. Burlington County Bridge Com'n***, 583 A.2d 1218, 1223 (Pa.Super. 1990). In contrast to Pennsylvania jurisprudence, Maryland utilizes the doctrine of contributory

negligence, which protects defendants from tort claims if the plaintiff is found to be negligent to any degree. *See Coleman v. Soccer Ass'n of Columbia*, 69 A.3d 1149 (Md. 2013). As application of either state's negligence law would further the underlying policies of that state, a true conflict exists herein.

Having found a true conflict of law, we next must determine which state has the most significant relationship to the parties and the occurrence in order to determine which jurisdiction's substantive law applies. As we explained in *Troxel*, *supra* at 1181 (quoting *Normann v. Johns-Manville Corp.*, 593 A.2d 890, 893 (Pa.Super. 1991)), the relevant inquiry is "the extent to which one state rather than another has demonstrated, by reason of its policies and their connection and relevance to the matter in dispute, a priority of interest in the application of its rule of law."

In this case, the parties all have close ties to Pennsylvania, as Appellants are Pennsylvania residents, and Mr. Marks' employer, King's Quality Foods, and the company to which he was delivering products, Redner's, are both Pennsylvania corporations. Conversely, the accident occurred at a Redner's facility located in Maryland, one of four stores Redner's operates pursuant to the laws and requirements of that state. Hence, Pennsylvania has a significant relationship to the parties and a corresponding interest in providing redress for wrongs committed by or

against its citizens.[3]  However, Maryland has a significant relationship with

the occurrence itself, *i.e.*, the place where both the injury and the negligent

conduct occurred.[4]  Additionally, Maryland has an interest in regulating the

---

[3] Appellants argue that the application of Pennsylvania law would promote the state's interest in limiting the cost of workers' compensation insurance by "allowing subrogation in accordance with its workers' compensation act." Appellant's brief at 34.  Appellants imply that the use of Maryland's contributory negligence law could reduce the worker compensation carrier's right of subrogation and trigger an increase in coverage rates. *Id*. at 34-35. We find that the presumed connection between Maryland's contributory negligence law and the imagined increase in Pennsylvania insurance rates is too tenuous to have any bearing upon our choice-of-law analysis.

[4]  Appellants contend that the deposition testimony of the Redner's employee responsible for the receiving area where the fall took place established that the unsafe condition was the result of corporate policies developed in Pennsylvania.  Appellants' brief at 19.  According to Appellants, Brenda Roberts testified that she received safety training from the person responsible for the receiving area of the Redner's store in Oxford, Pennsylvania.  *Id*.  As such, Appellants insist that "Redner's had safety policies or training practices which were applied in Pennsylvania and Maryland similarly, which are much more applicable than any code in Maryland. *Id*.

Based upon our review, however, Ms. Roberts' deposition testimony did not provide any evidence that the safety policies or training practices she employed in Maryland were developed in Pennsylvania, or that the Maryland store where the fall occurred was operating in accordance with any standards developed in Pennsylvania for use in all Redner's stores, including in Pennsylvania, Maryland, and Delaware.  Plaintiffs' Response to Defendants' Motion for Summary Judgment, 12/18/2014, Exhibit F.  At most, her testimony established that she traveled to a store in Oxford, Pennsylvania to receive her training—not that the policy was designed at that location.

As Appellants failed to demonstrate that their injuries were the result of a corporate decision or policy, we reject Appellants' contention that the negligent conduct in this case occurred in Pennsylvania at the corporate level.

conduct of, and prescribing the liability of, businesses operating within its borders.

Appellants refer us to **Carter v. National R.R. Passenger Corp.**, 413 F. Supp.2d 495 (E.D. Pa.2005). In **Carter**, a Pennsylvania resident brought an action against Amtrak for injuries sustained when disembarking from a train in Maryland. **Id**. at 497. The federal district court applied Pennsylvania's comparative negligence law and a jury awarded the plaintiff $875,000, which was reduced to $612,500 as a result of the plaintiff's 30% responsibility for his injuries. In ruling that Maryland had no interest in the application of its contributory negligence defense, the federal district court stated:

> Similar to United Airlines in **Griffith**, it cannot be said that Amtrak, as an interstate common carrier, relied on Maryland's contributory negligence defense. Nor does Maryland have any interest in limiting Amtrak's liability to protect the state's business climate. Amtrak is an out-of-state corporation whose main tracks traverse the state between Delaware and the District of Columbia. Whether or not Maryland has a contributory negligence bar will not affect in any way whether Amtrak will continue to operate there. Unlike other businesses, it cannot pick up and leave.

**Id**. at 500.

We disagree with Appellants' contention that **Griffith** and **Carter** require the application of Pennsylvania substantive law in the case at bar. Unlike Amtrak and United Airlines, Redner's is not an interstate common carrier that would not have relied on Maryland's contributory negligence

defense in deciding to operate in the state. In reality, Redner's operates four brick and mortar facilities in Maryland and its decision to continue to conduct business in Maryland may, in fact, be influenced by the state's contributory negligence defense. Thus, Maryland possesses an interest in limiting Redner's liability as a means of protecting the state's business climate. In contrast to a common carrier's transient connection with Maryland, Redner's might elect to "pick up and leave," the state. *Id*. at 500. Thus, where the district court determined in *Carter* that Maryland lacked an interest in the application of its contributory negligence defense to limit an out-of-state corporation's liability, instantly, Maryland has an interest in the application of that defense in relation to a business that operates four stores within its boundaries.[5] For these reasons, Appellants' reliance upon *Carter* is not persuasive.

Indeed, contrary to Appellants' protestations, our review of Pennsylvania case law addressing similar conflict-of-law issues reveals that Maryland has the more significant interests herein. In *Troxel*, for example, two Pennsylvania residents, Mary Siple and her infant daughter Ashley, traveled to Delaware for medical treatment, during which Ashley was diagnosed with cytomegalovirus ("CMV"). *Id*. at 1180. Mary Siple, who had

---

[5] Focusing solely upon the fact that Redner's was organized in Pennsylvania, Appellants ignore the benefits that inure to Redner's by conducting business in Maryland and they discount the potential for Maryland's pro-defendant policies to affect Redner's business decisions relating to the four stores that it maintains in that state.

not been informed that CMV was both contagious and posed a special danger to pregnant women, allowed a family friend, Grace Troxel, to assist in Ashley's care. *Id*. Grace Troxel contracted CMV and her infant son died from the disease soon after his birth. *Id*.

Grace Troxel and her husband filed wrongful death and survival actions in Pennsylvania against the Delaware health care providers who failed to inform Mary Siple about the dangers of CMV. *Id*. Despite Pennsylvania's relationship to the parties, this Court concluded that Delaware law applied in the actions against the Delaware health care providers. In so concluding, this Court stated:

> The patient, who was a resident of Pennsylvania, was taken to Delaware for treatment and was treated by [defendants] exclusively in Delaware. No services were rendered by [defendants] in Pennsylvania. The services rendered and the persons delivering those services in Delaware were regulated by the laws of Delaware, not the laws of Pennsylvania. In treating Ashley, therefore, the hospital was required to follow and abide by the laws of Delaware. As such, [defendants] were entitled to rely on the duties and protections provided by Delaware law. Pennsylvania law did not follow Ashley and her mother when they traveled to Delaware to obtain medical care. Any other rule would be wholly unreasonable, for it would require hospitals and physicians to be aware of and be bound by the laws of all states from which patients came to them for treatment. This is not the law.

*Id*. at 1181.

Similarly, in **Levin v. Desert Palace Incorporated**, 465 A.2d 1019 (Pa.Super. 1983), a Pennsylvania resident brought a negligence action

against a Nevada hotel. In determining that Nevada law, rather than Pennsylvania law, applied, this Court reasoned as follows:

> Obviously, Pennsylvania has an important interest in protecting the welfare of its citizens. We conclude, however, that this interest is outweighed by Nevada's interest in regulating the conduct and prescribing the liability of hotel owners within its jurisdiction. A hotel owner relies on the laws of the state in which the hotel is located to determine the standard of conduct required of him. It could not be expected that a hotel should comply with the laws of all the states of which its guests are citizens.

*Id*. at 1021.

Finally, we find persuasive the reasoning of the United States Court of Appeals for the Third Circuit in *Shuder v. McDonald's Corp.*, 859 F.2d 266 (3d Cir. 1988). In *Shuder*, a Pennsylvania resident fell in a McDonald's Restaurant parking lot in Virginia. *Id*. at 266-67. In reversing a verdict for the plaintiff based upon Pennsylvania law applying comparative negligence rather than Virginia's contributory negligence, the Third Circuit provided the following analysis:

> We think it is clear that Virginia has by far the more significant contacts. To start with, the accident occurred in Virginia. Further, the Shuders voluntarily went to that state. Surely Virginia has an interest in how persons conduct themselves within the state. The place of the accident was not fortuitous as, unlike in *Griffith*, this case did not involve a moving instrumentality. Rather, the accident arose from the use of and condition of property, traditionally matters of local control. Indeed, a building permit was obtained for the driveway on which Mrs. Shuder fell. The Shuders, at trial, urged that the property was negligently constructed or designed, again matters of local concern.

- 12 -

*Id*. at 272.

As in *Troxel*, *Levin*, and *Shuder*, the alleged tortious conduct in this case occurred in Maryland. Also, to the extent that Mr. Marks went to Maryland as a condition of his employment as a deliveryman with King's Quality Food, his presence in the state was not fortuitous, as in *Griffith*. Moreover, like the incident in *Shuder*, the accident stems from the use and condition of property located in Maryland, "traditionally matters of local control," and that state undoubtedly has a significant interest in regulating the conduct of businesses operating there. *Shuder*, *supra* at 272. Furthermore, the Appellants' allegations of wrongdoing directly implicate the activities of Redner's' employees at a facility located in Maryland and operated pursuant to the laws of the State of Maryland. Pennsylvania appellate courts have applied the law of other jurisdictions where appropriate, even when it prevents Pennsylvania residents from obtaining a tort recovery. *See Cipolla*, *supra* at 854 ("Inhabitants of a state should not be put in jeopardy of liability exceeding that created by their state's law just because a visitor from a state offering higher protection decides to visit there."). Accordingly, we conclude that the trial court did not err in ruling that Maryland law applies in the present case.[6]

---

[6] This conclusion is consistent with the Restatement (Second) of Conflict of Laws § 164, regarding contributory fault. That provision reads (emphasis added),

Turning to the second issue raised on appeal, Appellants assert that the trial court erred and abused its discretion by granting summary judgment in favor of Redner's based upon its conclusion that a jury could not find Redner's 100% responsible for Mr. Marks' injuries. *See* Appellants' brief at 35-50. Appellants contend that reviewing all of the facts of record in the light most favorable to them, Maryland case law dictates that it must be left for a jury to decide whether Mr. Marks was contributorily negligent. *Id.* at 36-37, 39-40, 43-47. We agree.

Pursuant to well-settled Maryland law, a finding that a plaintiff was contributorily negligent operates as a complete bar to recovery against a defendant who was also negligent. *Wooldridge v. Price*, 966 A.2d 955, 961 (Md.App. 2009). "To establish contributory negligence as a matter of law, the act relied on must be distinct, prominent and decisive, and one about which ordinary minds cannot differ." *Catler v. Arent Fox, LLP*, 71 A.3d 155, 180 (Md.App. 2013) (citation omitted).

> Before the doctrine of contributory negligence can be successfully invoked, it must be demonstrated that the injured party acted, or failed to act, with knowledge and appreciation, either actual or imputed, of the danger of injury which his conduct involves. Stated another way, when one who knows and appreciates, or in the exercise of ordinary care should know and

---

(1) The law selected by application of the rule of § 145 determines whether contributory fault on the part of the plaintiff precludes his recovery in whole or in part.

(2) **The applicable law will usually be the local law of the state where the injury occurred**.

appreciate, the existence of danger from which injury might reasonably be anticipated, he must exercise ordinary care to avoid such injury; when by his voluntary acts or omissions he exposes himself to danger of which he has actual or imputed knowledge, he may be guilty of contributory negligence.

***Thomas v. Panco Mgmt. of Maryland, LLC***, 31 A.3d 583, 602 (Md. 2011) (citation omitted).

"Ordinarily, contributory negligence is a question of fact that is for the jury to decide. Only when no reasonable person could find in favor of the plaintiff on the issue of contributory negligence should the trial court take the issue from the jury." ***McQuay v. Schertle***, 730 A.2d 714, 721 (Md. App. 1999) (internal citations omitted). The burden of proof is on the defendant to prove the contributory negligence of the plaintiff. ***Bd. of Trustees, Cmty. Coll. of Baltimore Cty. v. Patient First Corp.***, 120 A.3d 124, 135 (Md.App. 2015).

In addressing this issue, the trial court discussed the above-cited legal principles and summarized the facts that it considered relevant to the accident. It then concluded that Mr. Marks was guilty of contributory negligence as a matter of law. The trial court reasoned,

> In the case *sub judice*, the evidence indicates that [Mr. Marks] did not look where he was going or take any other precautionary measures to avoid his accident. During [Mr. Marks'] deposition, when asked if he looked at the ground as he walked into the back door at Redner's, [Mr. Marks] stated "No. I look straight ahead." (Deposition of Darrel Marks, p. 58 ¶¶ 15 - 24). [Mr. Marks] also admitted that he knew that pallet jacks, like the one he fell over, were used by delivery people for Redner's and that he saw such pallet jacks at that Redner's

- 15 -

location in the past. (Id. at p. 68 ¶¶ 12 -24). Even after construing the evidence in a light most favorable to [Mr. Marks], it is obvious that [Mr. Marks] took no precautionary measures to make sure there were no obstructions in his path, despite knowing that the warehouse in which he was entering often had pallet jacks inside. [Mr. Marks'] failure to even scan the interior of the doorway before he walked in indicates a failure to use that common caution that an ordinarily prudent person would use under the same or similar circumstances. As a result, this court is convinced that no reasonable jury could find that [Mr. Marks'] own negligence did not contribute to his injury. Thus, because it is clear and free from doubt under Maryland law that [Mr. Marks] was contributorily negligent, [Mr. Marks] is barred from recovery.

*Id*. at 7.

Based upon our review of the record, we agree with Appellants that the trial court failed to view all of the facts presented in the light most favorable to them. Properly viewed, the record reflects that Mr. Marks had been making deliveries to Redner's in Elkton, Maryland approximately twice per month for the preceding nine months. Mr. Marks' Deposition, 8/20/14, at 47-48. He was aware that Redner's generally stored products on skids, but on the day in question, he did not see very many in the warehouse or any in the path that he walked. *Id*. at 57.

He further explained that Redner's required him to follow an established procedure when making deliveries to the Elkton store. He was required to: (1) park the truck; (2) sign the sign-in sheet in the warehouse; (3) go into the store and remove any expired or opened products on the shelves; (4) return to the truck with those products; (5) place new products

from the truck into a handcart; (6) bring the handcart of new products into the warehouse to the receiver who "checks it in to make sure everything that's on the list is there"; (7) go into the store and put the new products on the shelves; and (8) sign out on the same sign-in sheet. *Id*. at 51-52. Mr. Marks was following this procedure on the day of his accident. *Id*. at 59-76.

When he entered the warehouse to sign in, Mr. Marks encountered no difficulties and there were no obstructions on the floor. *Id.* at 62, 64-65. He likewise saw no skids or pallet jacks on the floor when he left the warehouse the first time. *Id*. at 69. After returning to his truck and loading his handcart with new product, the cart weighed approximately 100 pounds. *Id*. at 70. He reentered the warehouse about ten minutes after his sign-in visit. *Id*. at 69. He walked up the ramp to the warehouse pulling the handcart behind him. *Id*. at 71. To enter the warehouse, Mr. Marks had to balance the product on his cart and hold open the door to the warehouse, which opened toward the outside. *Id*. at 71-72. He had to hold the door with one hand and pull the cart through the doorway with the other, so his body was "twisting" as he walked. *Id*. at 75. He testified that he looked straight ahead as he walked into the warehouse, not at the ground, because that was how he naturally walked, and since there had not been any obstructions on the ground when he walked that same route minutes earlier, he had no reason to look down. *Id*. at 58, 73.

Mr. Marks testified that it was bright outside and the inside of the warehouse was dark, which required his eyes to adjust to the differing lightening conditions. *Id*. at 74. He took two steps inside the warehouse, whereupon he tripped over the forks of a pallet jack. *Id*. at 73, 76, 78. As the forks of the pallet jack were low to the ground and a similar color to that of the warehouse floor, he did not see them before he tripped. *Id*. at 57, 78, 82.

Analogous Maryland case law precludes the grant of summary judgment in this case on contributory negligence grounds. In ***Diffendal v. Kash & Karry Serv. Corp.***, 536 A.2d 1175 (Md.App. 1988), the Maryland Court of Special Appeals reversed the trial court's grant of summary judgment based upon contributory negligence after Anna Diffendal was injured while shopping at the Kash and Karry supermarket. *Id*. at 1176. Mrs. Diffendal had walked to a case of frozen items, picked a product out of the freezer, and was proceeding back to her shopping cart when she fell over an L-bed cart that was in the aisle. *Id*.

Mr. and Mrs. Diffendal filed a complaint against Kash and Karry seeking damages for Mrs. Diffendal's injuries and for loss of consortium. *Id*. Kash and Karry filed a motion for summary judgment based on Mrs. Diffendal's contributory negligence, which the trial court granted. *Id*. at 1176-77. The Diffendals appealed and the Court of Special Appeals reversed, holding, "Mrs. Diffendal's failure to look down the aisle before

proceeding to her cart was not such a 'prominent and decisive act' from which reasonable minds could not differ that she was contributorily negligent." *Id*. at 1177. According to the Maryland appellate court,

> More than one inference is permitted under the circumstances of this case. It could be inferred that, under these circumstances, Mrs. Diffendal was not negligent in failing to have noticed the cart over which she fell, or in failing to have avoided the injury she sustained. In addition, Mrs. Diffendal stated in an affidavit that she did not see the L-cart before she fell. Thus, it may be inferred that the cart was placed in the aisle after she began looking for the waffles. A reasonable inference is that an ordinarily prudent person, while shopping in a supermarket, with her attention drawn to the selection of merchandise displayed in an open food freezer, could make the same error of judgment, and trip over a cart placed in an aisle near the displays of merchandise.

*Id*. at 1178.

Instantly, as in *Diffendal*, Mr. Marks' failure to look down as he walked into the Redner's warehouse through the same threshold that he entered ten minutes earlier without obstruction, while his attention was drawn to the product in his heavy handcart, did not make him contributorily negligent as a matter of law when he tripped over the forks of a pallet jack that had been placed in his path in the interim. Accordingly, the trial court erred and abused its discretion by granting the motion for summary judgment. Hence, we reverse the trial court's grant of summary judgment and remand for further proceedings.

Order affirmed in part and reversed in part. Case remanded. Jurisdiction relinquished.

Judge Platt Joins the Opinion.

Judge Panella Concurs in the Result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/17/2016